## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

**HALSTON GIBSON,**

   **Plaintiff,**

  **v.**

**GABLES RESIDENTIAL SERVICES, INC.,**

   **Defendant.**

Civil Action No. 1:21-cv-02952 (DLF)

## PLAINTIFF'S MEMORANDUM OF LAW IN OPPOSITION
## TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

This case is about whether the Defendant failed to accommodate Plaintiff Halston Gibson when, as a result of the pandemic, the Plaintiff needed to take extra precautions to prevent illness due to her disabling condition. The record demonstrates that the Plaintiff had been performing her job responsibilities before March 2020, when the pandemic changed her workplace in such a way that she sought accommodations that would minimize the likelihood that she would get ill. The accommodations she sought were reasonable, but the Defendant's view of how the job should be conducted prevented its representatives from engaging with the Plaintiff to find ways for her to continue performing her job responsibilities in conditions that minimized her possibly becoming ill. Therefore, failing to engage in the interactive process, the Defendant ultimately failed to accommodate Plaintiff.

Plaintiff, Halston Gibson, opposes Defendant's Motion for Summary Judgment, and respectfully requests that the court deny Defendant's Motion in its entirety. Plaintiff has submitted a response to Defendant's Statement of Undisputed Facts, as well as Plaintiff's Statement of Material Facts, in a separate document.

## LEGAL STANDARD

Upon moving for a motion for Summary Judgment, the moving party has the initial burden of demonstrating the absence of a genuine dispute as to any material fact. *Craig v. D.C.*, 74 F. Supp. 3d 349, 360 (D.D.C. 2014). A fact is material if it might affect the outcome of the litigation. *Anderson v. Liberty Lobby Inc.*, 477 U.S. 242, 248 (1986). Once the moving party has met its burden, to defeat the motion the nonmoving party must designate specific facts showing that there is a genuine issue for trial. *Id.* Though the Court may not resolve genuine disputes of fact in favor of the party seeking summary judgment, the nonmoving party must show more than the mere existence of a scintilla of evidence in support of its position. *Bell v. E. River Fam. Strengthening Collaborative, Inc.*, 480 F. Supp. 3d 143, 148–49 (D.D.C. 2020). The determination of whether a given factual dispute requires submission to a jury must be guided by the substantive evidentiary standards that apply to the case. *Id.*

In considering a motion for summary judgment, the evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in her favor. *Rodriguez v. WMATA*, No. CV 19-3710 (JEB), 2021 WL 3722729, at *2 (D.D.C. Aug. 23, 2021). The non-moving party's opposition, however, must consist of more than mere unsupported allegations or denials and must be supported by affidavits, declarations, or other competent evidence, setting forth specific facts showing that there is a genuine issue for trial. *Pitts v. Howard Univ.*, 111 F. Supp. 3d 9, 16 (D.D.C. 2015).

## ARGUMENT

### 1. Defendant Failed To Reasonably Accommodate Plaintiff

#### a. Plaintiff was a qualified individual

> i. A reasonable jury will find that Plaintiff's essential functions could be performed remotely at all hours, and onsite after hours, and that her essential functions did not require her to be on-site during the day.

A "qualified individual" means "an individual who, with or without reasonable accommodation, *can* perform the essential functions of the employment position that such individual holds." 42 U.S.C. § 12111(8). *Minter v. D.C.*, 809 F.3d 66, 69–70 (D.C. Cir. 2015) (emphasis added). The material facts demonstrate that the Plaintiff was doing her job before the pandemic. [1] Defendant's argument that Plaintiff is qualified illustrates how it mistakenly equates the legal standard— *whether an employee could perform her essential job functions with or without an accommodation* with— *whether an employee could perform the job in the manner preferred by the employer*. They are not the same.   The only relevant test is whether Plaintiff *could have* performed the essential functions of her job through any one or combination of the several options she asked the Defendant to consider.  Alternatively, Defendant could have offered another option that would have allowed Plaintiff to perform her job duties or, as a matter of last result, reassign Plaintiff.  However, the record demonstrates that the Defendant did not do that and instead forced Plaintiff to exhaust her leave and ultimately terminated her.

---

[1] The EEOC guidelines, which can be a helpful guide to this Court, states that the following are some of what is considered as evidence in assessing essential job functions:
(1)      The written job description prepared before advertising or interviewing for a job
(2)      the actual work experience of present or past employees in the job,
(3)      the time spent performing a function,
(4)      the consequences of not requiring that the employee perform a function[.]
The ADA: Your Responsibilities as an Employer. Available at:
https://www.eeoc.gov/laws/guidance/ada-your-responsibilities-employer.

Being on-site and available at the Berkshire in person only during the daytime was not an essential function of Plaintiff's job, therefore requesting to work at hours when there were few or no people on site who could potentially pass along the coronavirus, did **not** impact the performance of the essential job functions. The essential functions of Plaintiff's job include communicating with residents and scanning checks. Plaintiff has provided evidence indicating that she could "interface" with the residents via phone and email (or even over zoom), and that even before the pandemic, emails and phone calls were how residents and management typically communicated.[2] She could also scan the checks after hours at the Berkshire, or take the scanner to 215 C Street, and scan the checks there during the day. Here, Defendant's facts do not show that Gibson would not have been *able* to do her job remotely or onsite after 5 or 6 p.m.—rather, Defendant's facts simply show Defendant's *preferred* way to do Gibson's job was in-person and on-site, only between 9 a.m. and 6 p.m. However, even if Plaintiff would not be able to perform the essential

---

[2] Defendant's argument that Berkshire residents of D.C. were suddenly desperate for some in person, face-to-face action with the Berkshire staff *because of* the pandemic creates a material dispute, because a reasonable jury would believe that the exact opposite was true. Defendant's SOMF 83 states that "there was an even greater need for management [to be physically] onsite to handle the various questions that were being asked regarding Gables' response to the pandemic[.]" However, it is quite questionable that people would risk their health and their lives in order to stop by the management's office during the most deadly phase of the pandemic, to simply ask questions such as, "how is Gables responding to the pandemic?" During the time when most people in apartments were ordering groceries online and asking delivery personnel to leave it by the door instead of interacting, Defendant's claim is not something a reasonable jury would believe.

The same goes for Defendant's argument that the Asian exchange students were "traumatized" with the covid pandemic and that they therefore sought out Jose Alvarado in person. Plaintiff stated in her declaration that these were students who were new to the United States and new to the English language, and therefore, they could *not* communicate in person at all or even via phone, so most if not all of communications conducted with the foreign students were done by email.

functions the way Defendant simply *desired*, Plaintiff *could* fully perform her essential functions[3] remotely[4] and after 6 p.m., which makes her a qualified individual under the law.

Furthermore, based on the evidence provided by the parties, a reasonable jury will find that Plaintiff's essential functions could be performed remotely at all hours, and onsite after hours, and that her essential functions did not require her to be on-site during the day. Defendant's main contention regarding the necessity of being onsite is to field questions from the walk-in residents who find and enter the management office. To support the purported onsite-nature of Plaintiff's duties, Defendant offers the declaration of De'sert, the incumbent ACM ("Assistant Community Manager"), where he states that he interfaces with up to 20 people (residents/guests/vendors) a day. The problem with this evidence, besides the fact that he is stating facts relating to year 2023, and not what happened in 2020—is that he does not make it clear whether these numerous interfacing consisted of him just walking around the building and inserting himself into random, social conversations, or whether the interfacing pertains to the "walk-ins" who entered the management office, or whether the interactions were work-related at all. Varied inferences can be drawn from these vague statements, and this stage, the one most reasonably favorable to Gibson must be drawn: De'sert's up-to twenty daily conversations he has with "guests" and vendors and residents do not necessarily involve only work-related matters, and these conversations are not limited to the "walk-ins". This inference is reasonable because Gibson stated in her declaration that there were at most 1 or 2 walk-ins to the management office in a week.

---

[3] Her essential functions included mainly communicating with residents via phone and email, and scanning payment checks and posting them on the residents' online accounts.

[4] Plaintiff was granted the remote VPN access on May 4, 2020; the check scanner could be removed to any location, including to 215 C Street; she was willing to and could access the Berkshire at evening hours; and almost all of D.C. government procedures that typically required in-person attendance were fully transitioned into remote procedures.

Moreover, Desiree Marshall states in her deposition that Gibson had told her that there were many walk-ins at the Berkshire "office." This testimony does not weigh in favor of Defendant's assertion that walk-in questions were frequent and numerous at the management office, because the testimony does not state at what time Ms. Gibson made the statement (early during her employment, just before the pandemic, or after the pandemic started), and it does not specify whether it means management office, or the office of the Berkshire in general. The vagueness matters because Gibson's declaration is very specific—she states that most residents, even before the pandemic, would call or email the office if they ever had any questions, and that at the very *most*, one or two people would drop by the management office during any given week, but that in most other weeks, no residents dropped by at all. Marshall further testified that *anyone* could field any resident walk-in questions as long as the employee was there, and that leasing officers were the real resident-facing employees and their physical presence at the site was more crucial than an ACM's.

Also, from March 2020 until June 15, 2020, Gables did not even allow walk-ins, and allowed residents to enter the management office and ask questions only after making an appointment. But there is no evidence indicating a single person made an appointment during this period. Def. Facts ¶¶ 127, 165, 168. *cf.* Def. Memo. at 34-35 (stating that 30-40% of Plaintiff's job required her to field questions of the walk-in residents to the management office)[5]. And this leads to the conclusion that it was not necessary for Plaintiff to be physically present at the management office in 2020 because she could answer phone calls and emails from home.   Therefore, these

---

[5] So Defendant's denials of Plaintiff's RA requests, especially prior to June 15, are unreasonable and are based on assertions not supported by facts.

disputed material facts create a triable issue of material fact regarding whether walk-ins were actually a large part of Plaintiff's essential duties which necessitated physical presence on-site.

Judge McFadden's opinion in *Coors*, cited by Defendant, is factually distinguishable in a significant way. The Court there had found that Coors' job description stated that the position was associated with "50–60% travel." *George v. Molson Coors Beverage Co. USA, LLC*, 610 F. Supp. 3d 280, 285 (D.D.C. 2022), *aff'd,* No. 22-7111, 2023 WL 2661588 (D.C. Cir. Mar. 28, 2023). And the plaintiff testified that travel was "a big part of the position" and "that he traveled outside the D.C. area 40 to 50 percent of the time." *Id.* The plaintiff also sent emails indicating he was aware of the "60% minimum" travel requirements of his job. *Id.* at 289. Based on all this evidence, but in particular, the job description, the Court found that plaintiff could not perform his essential functions without travelling. *Id.* at 288-89. In contrast, while Defendant argues that Gibson's main role is to be the 'face' of the company and that she needed to always be onsite, Gibson's job description does not indicate or imply anything about being the face, nor does it state anything about onsite presence.  Moreover, the record reflects that there were others who could be the face of the company to the residents, including the 24-hour concierge and members of maintenance. Gables also argues that "30% or 40%" of Plaintiff's job required her to field residents' questions on site. In fact, most of the questions from residents came through email; therefore, responses could come from anywhere.  However, Gibson's job description does not state that Plaintiff needed to be in the building or on-site, at all, to perform her job, while in *Coors*, travel is an explicit condition in the job description. Therefore, unlike the job description in *Coors*, Plaintiff's job description does not contain statements reflecting that the essential job functions had to be conducted on site.  Because the facts here are dissimilar, the reasoning of *Coors* is inapplicable to this case.

Lastly, Defendant does not offer any specific evidence of Plaintiff's on-site duties or tasks—nothing more is offered than highly hypothetical situations where an onsite task *may* materialize and Gibson would have to respond on-site. Other than a single example of an onsite fire that Gibson was asked to photograph for Alvarado one time, there are no concrete examples that have not been made redundant by the pandemic. "Although the absence of evidence is not necessarily dispositive, it at least permits a factfinder to draw an inference" here that the absence of evidence is due to absence of actual on-site tasks that belong essentially to Gibson. *See Seed Co. Ltd. v. Westerman*, 832 F.3d 325, 338 (D.C. Cir. 2016).

   ii. The essential duties of an Assistant Community Manager (ACM)
   changed over time due to the pandemic.

A reasonable jury will credit Plaintiff's evidence over Defendant's regarding her essential duties, because they are based on (1) her own experience of what her essential duties actually entailed and (2) the changed work circumstances created by the pandemic, which eliminated almost all in-person interactions and were replaced by online or remote options. Defendant's evidence is based on either hypothetical situations, or evidence of irrelevant job descriptions from non-pandemic years 2019 and 2023. The ACM position has reasonably evolved throughout the years because of the pandemic, and the essential duties of an ACM in 2020, are completely different from the duties of an ACM in 2019 and 2023.

For example, the assistant community manager duties held by Plaintiff, back in March 2020, reasonably and significantly differ with the duties and practices of incumbent De'sert's in 2023, and also differs with duties that belonged to Jacqueline Gerber back in 2019 when she was still an ACM. Defendant uses job duties held by De'sert and Gerber as evidence of Gibson's duties, with no regard to the fact that the pandemic changed or eliminated many of Plaintiff's duties. Also, many of Defendant's SUMF are purely hypothetical scenarios, and they do not indicate if Gibson

was ever actually required to perform the duties that were attributed to her in the scenarios. For example, many of Defendant's facts simply begin with the phrase, "an assistant community manager's role is to do [XYZ.]" And such a fact is mostly supported by De'sert or Gerber's declarations regarding their own experiences in 2023 and 2019.

Although courts defer to the employer's description of essential duties, courts usually do not defer to defendant's description if reality contradicts it. For example, Defendant argues Plaintiff needed to be on site, even in March, April, May, June, and July 2020 (all of the times when Defendant denied accommodation to Plaintiff and ultimately fired her in July) to oversee evictions. However, the D.C. government had put a moratorium on evictions on March 11, 2020, and it was extended through October 2021.[6] Moreover, Defendant stated that Plaintiff needed to be onsite to facilitate Section 8 inspections. But all Section 8 inspections were also suspended by the D.C. government in March 2020. Pl.'s Ex. C. Defendant's statement of undisputed material facts indicate that Defendant clearly did not take the coronavirus pandemic and responses thereto into account before it asserted what Plaintiff's essential duties were in 2020. Therefore, any facts that did not take the pandemic into account renders them unusable for Defendant's motion for summary judgment, and the motion must be denied.

**b. Gibson's requests for accommodations were reasonable**

As to the requirement that the requested accommodation be reasonable, the plaintiff bears only a burden of production. *Laguerre v. Nat'l Grid USA*, No. 20-3901-CV, 2022 WL 728819, at *2 (2d Cir. Mar. 11, 2022) (quoting *Borkowski v. Valley Cent. Sch. Dist.*, 63 F.3d 131, 138 (2d

---

[6] Defendant's statement of fact states that, "an assistant community manager is required to be onsite at various stages of the eviction process: to hand deliver eviction documents to the tenant, provide keys to the U.S. marshals and escort them to the unit, and facilitate coordination of bulk trash removal to remove an evicted tenant's belongs[.]"

Cir. 1995)). Gibson has produced evidence showing that her doctor's remote work recommendation would last only up until September of that year, and not in infinity, as Defendant inaccurately asserts. Also, even *before* Plaintiff asked for remote work, she had previously asked Alvarado in person, that she be allowed to work in the evenings at the Berkshire in order to complete any on-site tasks.[7] She also asked Alvarado in person and by text, if she could work at 215 C Street, which had a one-person office and was isolated. These requests are clearly reasonable on their face.

Gables argues that Plaintiff sought remote work for an indefinite period of time into the future and that such accommodation request is unreasonable. However, the doctor initially *recommended* that Gibson work remotely until July, but then the doctor sent a final note in July indicating that Plaintiff should work remotely until September 30, 2020, and the doctor would re-assess the situation then. Nothing in this note, as reasonably read in July 2020, indicates that the requested timeframe was indefinite; it was a request to work remotely for the next two months. Gables also did not have a reasonable basis to assume that Gibson would be asking for continued remote work when September came. More importantly, Gibson's doctor expressly stated that she was making a recommendation and did not state that working from home was the only accommodation for Plaintiff.  In fact, she offered her phone number to discuss the accommodation with the Defendant.

This Court should assess the reasonableness of the requests based on what any reasonable person knew about the pandemic's longevity back in July 2020 (or March through July 2020), which is: not much. At the time the reasonable accommodations requests were made, even if Gables did not know when the pandemic would have subsided, Gables should have call Plaintiff's

---

[7] It is undisputed that Alvarado, Ney, and others at Gables knew about Gibson's disability, Lupus.

doctor to find out if the recommendation was indefinite, and if the doctor considered Plaintiff working on site in a more isolated place in the building to be an accommodation or if working at 215 C Street to be an accommodation.  Not inquiring about the restriction in terms of its limits in time and in space demonstrates that the Defendant was not engaged in the interactive process in good faith.

Also, if Gables had doubts, it had the obligation to ask follow-up questions to Plaintiff or the doctor, and not just arbitrarily assume that the request was made for an infinite period and terminate Plaintiff. *See Woodruff v. LaHood*, 777 F. Supp. 2d 33, 43 (D.D.C. 2011) ("[I]f the note from the doctor requesting accommodation was too ambiguous and the employer did not know what the employee wanted, the employer easily could have called the doctor for a clarification.") (internal quotation marks and brackets omitted) (quoting and citing *Bultemeyer v. Fort Wayne Cmty. Sch.*, 100 F.3d 1281, 1285 (7th Cir. 1996)). Therefore, because Gables failed to take steps to clarify it assumption that the recommended accommodation was indefinite, it was unreasonable for it to deny Plaintiff's accommodation request without engaging in the interactive process to see what other accommodations, Plaintiff and or her doctor would agree to that would allow Plaintiff to continue working.  Gables' failure to continue the discussions was therefore in violation of the DCHRA.

Lastly, Defendant also tries to justify its denial of Plaintiff's request to work after hours at the Berkshire by arguing that Plaintiff can perform her essential functions of her duties *only if* they are performed during the typical 9 to 6, on site. Defendant does not provide any logic as to why only the hours between 9 a.m. to 6 p.m. dictate the parameters of Plaintiff's essential duties, and why she cannot perform her essential duties after those hours. *See* Def. memo. at 35. Defendant argues that it was "during that span of hours that the ACM interfaces with residents and addresses

their needs and issues." But reasonably, residents can email at any hour, or call after 6 p.m., including after midnight, regarding any wide range of issues, and those inquiries can further be answered at any hour. So Defendant's reason for denying Plaintiff's request to work off-peak hours is not a legitimate nor reasonable one.

### c. Defendant Terminated Plaintiff Due to her Disability

Plaintiff was terminated due to her disability after Gables failed to accommodate her. In contrast, Gables created a remote position for a nondisabled employee. Jackie Gerber's "new" position, the "centralized business manager," had identical job descriptions as Plaintiff's position, and Gerber worked fully remotely in Ohio and Virginia, while managing the same three properties as Plaintiff (the Berkshire, Yuma Gardens, and 215 C street). The fact that Jackie Gerber was allowed to work remotely indicates strongly that Defendant's reason for rejecting Plaintiff's requests for reasonable accommodation is pure pretext. *See Spector v. D.C.*, No. 1:17-CV-01884, 2020 WL 977983, at *9 (D.D.C. Feb. 28, 2020) (despite citing a federal policy which purportedly precluded plaintiff's ability to telecommute, the evidence of two other similar employees who were allowed to telecommute indicated defendant's reason for denial of RA was pretext). Just like in *Spector*, evidence that an employee with a very similar, if not identical position was allowed to remote-work while Plaintiff was not, raises an inference that the "impossibility" defense regarding Plaintiff's remote-work requests, is pretextual. *See Solomon v. Vilsack*, 763 F.3d 1, 15 (D.C. Cir. 2014).

Based upon the record, a reasonable juror could find that Defendant could have continued to employ Plaintiff by accommodating her the way it accommodated Gerber. First, Defendant tries to argue that Plaintiff did not have VPN (Def. Memo. at 18). However, the record indicates that Plaintiff was given VPN access on May 4, so at the very latest, that is when Plaintiff could have

started working entirely remotely. Gibson Decl. ¶ 12; Ney Depo. 25:2-10. This fact, combined with the fact that Alvarado and many others had VPN and fully remote access even before the pandemic, raises an inference that Defendant always had the capacity to allow Plaintiff to telework, but just didn't. And the assertion that an ACM has the duty to interface residents while the central business manager does not, is also pretextual because the job descriptions for both positions (Plaintiff's Exhibit A) are literally identical, word for word. Defendant's arguments and evidence do not explain why an ACM has to interface residents on-site and the central business manager does not, when both positions are identical at its foundation—the job description. *See George v. Molson Coors Beverage Co. USA, LLC*, 610 F. Supp. 3d 280, 285.

Also, a dispute of material fact is created regarding which job description is even the applicable one. At Gerber's deposition, she was questioned at length about the job description which is attached to this memorandum as Plaintiff's Exhibit A. Counsel for Defendant did not object to this document at the deposition (offered as exhibit 1 at the deposition, Gerber Depo. at 14) or in its Motion for Summary Judgment, nor did Gerber deny in her deposition that the job description pertained to her role. Pl. Ex. H, Gerber Depo. 7:8-13 (After viewing Plaintiff's Exhibit job description, Gerber states "It looks like some of this is what I am responsible for."). But the job description submitted by Defendant at summary judgment is slightly different from the one Gerber examined at her deposition. Even so, the duties listed in that version also overlap with the same purportedly onsite duties that Defendant stated as rationale for denying Plaintiff's RA requests[8], and Gerber stated unequivocally that she was working fully remotely regardless of the job description. Defendant does not explain why Gerber's onsite duties as listed in the job

---

[8] i.e., receive rent and cash receipts, initiate evictions, ensure evictions follow current procedure, and prepare and deliver all legal and formal notices. ECF 26-7 at 53.

description could be handled by onsite staff but Plaintiff's onsite duties could not be. This creates an issue of material fact whether Defendant could have just as easily let Gibson work remotely full-time, as Defendant did for Gerber.[9]

Furthermore, this Court, in a similar case, found that there was sufficient evidence to raise an inference that the decisionmaker never intended to grant reasonable accommodation to plaintiff, based on email evidence presented to the Court. The email requested follow-up medical documentation from the plaintiff regarding whether the accommodation sought was permanent or temporary. The email stated that the supervisor "had explained to [plaintiff] previously that she needed to be cleared to return to work full duty by 12/24/07 or she would have to make other arrangements." *Hancock v. Washington Hosp. Ctr.*, 908 F. Supp. 2d 18, 24 (D.D.C. 2012). The Court found this email to create an inference that the supervisor had already made up his mind to not accommodate plaintiff when he sent this email. The Court further found that based on this email and other evidence, the reasonable accommodation request would have been denied no matter what documentation was ultimately submitted by the plaintiff. *Id.* Similarly, in the instant case, Ney writes to Gibson to ask her for medical clarification on exactly when Plaintiff could return to work on-site, and that if Gibson could not return soon, she would be terminated. Ney's email creates an undeniable inference that at the time this email was sent to Gibson, Ney had already made up her mind to not only terminate Gibson's employment, but also to deny her reasonable accommodation request.

---

[9] Also, the fact that a function originally held by Gibson and other assistant community managers—the resident audits—were handed off to the new position "central business manager" to "alleviate some of the duties of an assistant community manager" does nothing to strengthen Defendant's arguments. In fact, it just shows that one core function of an assistant community manager *can* be performed 100% remotely. *See* Ney Decl. ¶ 23.[9]

The Court also found that the defendant in *Hancock* was trying to mischaracterize the reasonable accommodation request made by the plaintiff: "Hancock was not, as of December 21, 2007, seeking the type of permanent restriction that WHC *misleadingly* argues." (emphasis added). *Hancock*, 908 F. Supp. 2d at 24. Similarly, Gables here is arguing that Plaintiff was terminated in part, and reasonable accommodation was denied because Gibson asked for allegedly indefinite, permanent remote work accommodation. But the recommendation from the doctor clearly states the remote work arrangement is recommended up to September 30, and that the doctor will reassess the situation then. A reasonable jury will not believe, based on the literal wording of the note, that Gables genuinely and reasonably believed that this note indicated a permanent arrangement. Therefore, summary judgment must be denied.

### d. Offering Plaintiff "medical leave" and one-day-a-week remote work as accommodations fail to be reasonable as a matter of law

"While the burden is on plaintiff to show the feasibility of any reasonable accommodation she contends defendants failed to provide, the burden is on defendants to show that their proposed accommodation was reasonable." *Woodruff v. LaHood*, 777 F. Supp. 2d 33, 44 (D.D.C. 2011) (quoting *Zamudio v. Patla*, 956 F.Supp. 803, 809 (N.D. Ill. 1997)). Defendant has not met that burden. Defendant argues that it did offer Plaintiff reasonable accommodation because in March 2020 it offered Plaintiff to take medical leave after Plaintiff had asked for reasonable accommodations. However, telling her to take leave in response to her requests for remote work and requests to work off-peak hours, fails to constitute as reasonable accommodation as a matter of law. This is because the accommodation did not allow Plaintiff to work at all—she was not given a VPN as of March and April 2020, nor did she have the remote access to Gables network that come with the VPN until May 2020. Plaintiff also did not ask to use her medical leave as an

accommodation. So Defendant had not given Plaintiff VPN access until May 4,[10] and the "leave as an accommodation" was "granted" sometime in March 2020. This means the purported accommodation that Defendant gave Plaintiff in March (or even April) was not a reasonable one, because Plaintiff was not able to do any significant work remotely without the VPN. The alleged accommodation simply did not allow Plaintiff to perform her essential functions, and therefore, the accommodation offer fails to be a reasonable one under the law. Therefore, Defendant's argument that it provided Plaintiff with a reasonable accommodation fails as a matter of law.

Moreover, Defendant also argues that it reasonably accommodated Plaintiff by allowing her to work remotely one day a week, from May 2020. Def.'s Memo. at 29. But one day a week of remote work, fails to be a reasonable accommodation as a matter of law. For one, the one-day accommodation was a 'privilege' that the company allotted to all eligible employees, in response to the pandemic—Defendant cannot conveniently stick that onto Plaintiff's case as a reasonable accommodation after the fact. Second, the law requires that an accommodation be reasonable— Plaintiff would still have been exposed to the virus at the Berkshire on four other days of the week, and therefore the offer would have done nothing to protect Plaintiff from the health hazard she was requesting to avoid on all four out of the five workdays. Also, the offer placed Plaintiff between a rock and a hard place: Plaintiff was stuck between the choice of not working and not being paid the other 4 days of the workweek or exposing herself to severe infection by going to Berkshire during business hours on 4 days a week.[11] Therefore, the offer of one-day remote work fails to

---

[10] Plaintiff was granted access to the Gables VPN on May 4, 2020, which Alvarado and Ney testified allowed employees to do their job fully off-site.

[11] Defendant keeps on suggesting that Gibson testified that she would not have been willing to come into Berkshire *at all* during the pandemic—but the most reasonable reading of her deposition testimony is that she was not willing to go to Berkshire *during regular office hours* when all the other staff were present, but that she *was* willing to go after hours, like she asked. It belies logic

16

constitute an offer of reasonable accommodation. *See Barth v. Gelb*, 2 F.3d 1180, 1187 (D.C. Cir. 1993).

Moreover, there was also no interactive process because Defendant did not offer Plaintiff anything else other than to outrightly deny her requests to work remotely and onsite after regular business hours. *See Woodruff v. LaHood*, 777 F. Supp. 2d 33, 43 (D.D.C. 2011). Even though Defendant asked Gibson for a doctor's note, as noted above, it would be clear to a reasonable jury that Patti Ney had her mind made up to deny the requests when she asked Gibson for the doctor's note indicating when Gibson could return to work while at the same time giving Gibson an ultimatum to return onsite soon or be terminated. *Hancock*, 908 F. Supp. 2d at 24. Simply asking for a doctor's note does not satisfy the legal sufficiency of an interactive process that is required by the DCHRA. *Woodruff*, 777 F. Supp. 2d at 43.

Lastly, as to undue hardship, there is none, because Plaintiff was not asking for indefinite remote work. And Plaintiff could do all her work after hours and off-site as needed. Defendant has not shown whether financially or otherwise, this would create any kind of hardship or difficulty for Gables. Defendant does reference a quasi-hardship to Alvarado, the individual, in that Alvarado had to shoulder a lot of Plaintiff's alleged duties, such as helping the Asian foreign-exchange students break their leases, in person. But the entire leasing team could handle those tasks that are clearly within their area of expertise—leasing; and Gibson stated in her deposition that she did not handle any leasing issues. Gibson Depo. 105:13-20. Therefore, although Alvarado may have been overwhelmed, he was not overwhelmed by tasks which fell into essential functions of Plaintiff's

_____

that Plaintiff would have asked Alvarado if she could go into Berkshire after hours when other staff went home, and then at her deposition testify that she would not have been willing to go into Berkshire even after hours.

job. He was overwhelmed because there were a lot of leasing issues that arose. But that is not hardship that relates to Plaintiff's RA requests because the tasks do not reasonably belong to Plaintiff. Lastly, the fact that Gables allowed Jackie Gerber to fully remote-work all the way from Ohio indicates strongly to a reasonable jury that there would have been no hardship in granting full remote-work arrangements to Plaintiff during a pandemic. *See Barth v. Gelb*, 2 F.3d 1180, 1187 (D.C. Cir. 1993).

**2. Plaintiff was Terminated Based On Her Disability.**

It is undisputed that Defendant terminated Plaintiff because Plaintiff could not come onsite on a daily basis, but the reason she could not come on site was directly related to her disability, Lupus. Plaintiff's doctor had recommended that she work remotely because Lupus imposed a serious health hazard for Plaintiff in case she contracted the covid. And Plaintiff knew her Lupus put her at serious risk, so she asked to work onsite in the evenings and in a less crowded Gables location, 215 C Street. Based on these facts, a reasonable jury would find that Defendant's reason for termination was pretext for disability discrimination, because terminating someone for reasons directly related to the reasonable accommodation requests and her disability is termination made in discrimination of the employee's disability. *Kennedy v. Buttigieg*, No. CV 19-2212 (RDM), 2023 WL 2561822, at *25 (D.D.C. Mar. 17, 2023).

Gables' failure to accommodate Gibson's disability resulted in Gibson's inability to perform certain, limited onsite tasks, such as scanning checks. And this in turn resulted in her termination; therefore, that is evidence of disability discrimination, and the termination was one made "solely" based on her disability. *Kennedy*, 2023 WL 2561822, at *25. Here, allowing Plaintiff to work on her on-site duties such as scanning the checks after 6 p.m., or work during the day at 215 C Street office, would have allowed her to perform all the essential functions. Further,

there is no evidence in the record that compels a reasonable juror to believe that this function had to be done only during the day or why she could not use her VPN anywhere and carry the check-scanner with her to the 215 C Street office. *Kennedy*, 2023 WL 2561822 at *25 ("Failure to consider the possibility of reasonable accommodation for such disabilities, if it leads to discharge for performance inadequacies resulting from the disabilities, amounts to a discharge solely because of the disabilities . . . the Department's failure to offer reasonable accommodations to resolve those performance issues may itself constitute disability discrimination.") (citation and internal quotation marks omitted).

**3. Plaintiff was terminated in retaliation for requesting Reasonable Accommodation.**

In order to state a retaliation claim under the ADA, the Plaintiff must show that (1) she engaged in a protected activity, (2) Gables took a materially adverse action against her, and (3) there was a causal connection between the protected activity and the adverse action. Gables stated that the reason for Plaintiff's termination was because Plaintiff was seeking an unreasonable accommodation of *indefinite* remote work. In other words, Plaintiff was engaged in a protected activity when Gables took a materially adverse action.  In this case, the action by Patti Ney was to force Plaintiff to exhaust her leave and lose her job protection under the FMLA allowing it to terminate her. Defendant essentially terminated Plaintiff for requesting reasonable accommodation. These facts, coupled with the temporal proximity of Plaintiff's requests and her termination, indicate to a reasonable jury that she was terminated in retaliation for making reasonable accommodation requests.

## <u>CONCLUSION</u>

For these reasons, Plaintiff respectfully requests that Defendant's Motion for Summary Judgment be denied in its entirety.

DATE: April 17, 2023

Respectfully Submitted,

/s/*Su Mi Park*
Denise M. Clark, D.C. Bar # 420480
Su Mi Park, D.C. Bar #155118
**CLARK LAW GROUP, PLLC,**
1100 Connecticut Ave., NW Suite 920
Washington, D.C. 20036
Telephone: (202) 293-0015
spark@benefitcounsel.com
dmclark@benefitcounsel.com
***Attorneys for Plaintiff***

**CERTIFICATE OF SERVICE**

I hereby certify that on April 17, 2023, I filed the foregoing opposition memorandum with the Court's ECF filing system, and it notified the Clerk of the Court, and all parties and counsel of record.

/s/*Su Mi Park*
Su Mi Park