UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

HALSTON GIBSON,

*Plaintiff*,

v().

GABLES RESIDENTIAL SERVICES, INC.,

*Defendant.*

No. 21-cv-2952 (DLF)

**MEMORANDUM OPINION**

Halston Gibson says that Gables Residential Services, Inc., her former employer, discriminated against her based on her disability when it did not allow her to work remotely during the COVID-19 pandemic. Gables replies that Gibson could not perform essential elements of her job offsite. Before the Court is Gables' Motion for Summary Judgment. Dkt. 26. For the reasons that follow, the Court will grant the motion.

**I.     BACKGROUND**[1]

Gables is a real estate company. Def.'s Statement of Undisputed Material Facts ¶ 1, Dkt. 26-3 ("Def.'s SUF"). It operates 21 residential buildings in the Washington, DC area. *Id.* ¶ 7. Its properties include the Berkshire, near American University, with 759 units; Yuma Gardens, in Van Ness, with 36 units; and 215 C Street, on Capitol Hill, with 64 units. *Id.* ¶¶ 7–8, 12–13; Search Results for "Berkshire Apartments to Yuma Gardens to 215 C Street," Google Maps, https://perma.cc/T3EW-5QC5 (showing location of each building).

---

[1] Consistent with the applicable legal standard, the Court recounts the facts of the case "in the light most favorable to the nonmoving party," Gibson. *Talavera v. Shah*, 638 F.3d 303, 308 (D.C. Cir. 2011).

1

Gibson began working at Gables in November 2018 as an "assistant community manager." Def.'s SUF ¶ 10. She served the Berkshire, Yuma Gardens, and 215 C Street, with a focus on the Berkshire. *Id.* ¶¶ 10, 12. Although the parties disagree on Gibson's precise duties, they agree that she helped "tend to" Berkshire residents' "complaints and requests." Pl.'s Statement of Material Facts ¶ 66, Dkt. 31-1 ("Pl.'s SUF"). They also agree that her role carried several back-office responsibilities, including assisting with corporate inspections of the Berkshire's files and facilities and "back[ing] up" her supervisor—the Berkshire's community manager—when necessary. Pl.'s Resp. to Def.'s SUF ¶ 26, Dkt. 31-1 (backup roles); Def.'s SUF ¶¶ 47–48; Dep. of Halston Gibson 100:13–101:10, Dkt. 31-5 ("Gibson Dep.") (audits). Gibson attended weekly staff meetings at the Berkshire, Gibson Dep. 108:21–109:7, and her job description tasked her with "[s]upervisi[ng]" the Berkshire's "office and maintenance team[s] in the absence of the [c]ommunity [m]anager," Gibson Dep. ex. 9 at 1, Dkt. 31-2.

Gibson suffers from lupus, an autoimmune disease. Pl.'s SUF ¶ 16. As a result, when the COVID-19 pandemic began in March 2020, Gibson felt unsafe working from her normal office in the Berkshire. Def.'s SUF ¶ 77; Pl.'s SUF ¶ 22. She asked whether she could work from home or from 215 C Street until the pandemic subsided, or at least for a significant period of time. *See* Pl.'s SUF ¶¶ 7–12; Def.'s SUF ¶¶ 79–82. She added that she could visit the Berkshire after usual business hours, when the building was less crowded, to perform tasks she could not perform remotely. Def.'s SUF ¶ 95; Pl.'s SUF ¶ 7.

Gables did not adopt Gibson's proposals. Instead, it placed her on medical leave. Pl.'s Resp. to Def.'s SUF ¶ 92; Gibson Dep. 167:5–8. Her last day in the office was March 17, 2020. Gibson Dep. 115:10–11, 145:3–6.

2

Gibson took leave through April 23, 2020.  On April 23, consistent with an offer Gables extended to all its employees, Gables allowed Gibson to work remotely one day a week to "perform[] select tasks that could be performed remotely."  Def.'s SUF ¶ 156 (uncontroverted).[2]  Gibson did so and spent her remaining four days per week on leave.  *Id.* ¶ 166.  In June 2020, however, Gables returned to full-time in-person work.  *Id.* ¶ 167.  Gibson did not return to the office and sought remote work through September.  Pl.'s SUF ¶ 26.  Gables declined and terminated her.  *Id.* ¶¶ 27–28.  Her termination took effect on July 20, 2020.  *Id.* ¶ 27–28.

Gibson sued under the D.C. Human Rights Act ("DCHRA") for disability discrimination, failure to accommodate, and retaliation.  Compl. ¶¶ 79–108, Dkt. 1-2.  After approximately nine months of discovery, Min. Order of Dec. 6, 2021, Gables moved for summary judgment, Dkt. 26.

## II.   LEGAL STANDARDS

Under Rule 56 of the Federal Rules of Civil Procedure, a litigant may move for summary judgment, "identifying each claim or defense . . . on which summary judgment is sought."  Fed. R. Civ. P. 56(a).  "The Court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  *Id.*  "[S]ummary judgment will not lie if . . . the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

---

[2] Gibson's Response to the Defendant's Statement of Undisputed Material Facts does not dispute paragraph 156 of the defendant's statement and does not offer citations to the record disputing it in substance.  Consistent with Federal Rule of Civil Procedure 56, the Court will treat the facts asserted in that paragraph as undisputed for purposes of this motion.  *See* Fed. R. Civ. P. 56(c)(1) ("A party asserting that a fact cannot be or is genuinely disputed must support the assertion by: (A) citing to particular parts of materials in the record . . . or (B) showing that the materials cited do not establish the absence or presence of a genuine dispute . . . ."); *id.* 56(e)(2) ("If a party fails to properly support an assertion of fact or fails to properly address another party's assertion of fact as required by Rule 56(c), the court may . . . consider the fact undisputed for purposes of the motion.").

"[T]he Court must draw all reasonable inferences in favor of the nonmoving party, and it may not make credibility determinations or weigh the evidence." *Reeves v. Sanderson Plumbing Prods.*, 530 U.S. 133, 150 (2000).

"A party opposing summary judgment must substantiate [its allegations] with evidence that a reasonable jury could credit in support of each essential element of [its] claims." *Menoken v. Burrows*, 656 F. Supp. 3d 98, 104 (D.D.C. 2022) (cleaned up). "The moving party is entitled to summary judgment if the opposing party 'fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial.'" *Id.* (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986)).

## III. ANALYSIS

### A. Disability Discrimination

The DCHRA makes it "an unlawful discriminatory practice" to "discharge" or "otherwise . . . discriminate against any individual" for a "discriminatory reason based" in whole or in part on "actual or perceived . . . disability." D.C. Code § 2-1402.11(a), (a)(1)(A). "To show unlawful discrimination" under this section, a plaintiff must show "that she was qualified for [her] position with or without a reasonable accommodation[] and that she suffered an adverse employment action because of [her] disability." *Hunt v. Dist. of Columbia*, 66 A.3d 987, 990 (D.C. 2013) (cleaned up). The Court will grant summary judgment to Gables on Gibson's disability discrimination claim because no reasonable jury could conclude that Gibson was qualified for her position with or without a reasonable accommodation.

A qualified individual can "perform the essential functions of her position" if given a reasonable accommodation, a standard mirroring the Americans with Disabilities Act's ("ADA"). *Id.* (quoting *Carr v. Reno*, 23 F.3d 525, 529 (1994)). Under the DCHRA, as under the ADA, courts

4

give "substantial weight to [an] employer's view of job requirements," including whether a function is essential. *Id.* (quoting *Ward v. Mass. Health Rsch. Inst.*, 209 F.3d 29, 34 (1st Cir. 2000)); *see Turner v. D.C. Off. of Hum. Rts.*, 243 A.3d 871, 876 (D.C. 2021). They also consider whether an employer's "[w]ritten job descriptions" emphasize a particular function, whether employees spend substantial periods of time performing the function, and whether other current or past employees have performed that function. 29 C.F.R. § 1630.2(n)(3)(ii); *see Hunt*, 66 A.3d at 991 (citing 29 C.F.R. § 1630.2(n)(3)). And they examine whether, in fact, an employee who could not perform that function could still do her job well. *See, e.g.*, *id.*; *George v. Molson Coors Beverage Co. USA, LLC*, 610 F. Supp. 3d 280, 289 (D.D.C. 2022).

Some cases illustrate how this test applies in practice. On one side of the line, consider *Hunt*. A prison guard's anxiety disorder made it difficult for her to work with inmates. 66 A.3d at 989. She said she could do her job anyway by avoiding inmate contact and by taking breaks after contact occurred. *Id.* at 990–91. The D.C. Court of Appeals disagreed and granted summary judgment for the prison, holding that "contact with inmates was an essential job function of a correctional officer" and that taking breaks after contact would not be feasible as a matter of law. *Id.* at 991. Or consider *Doak v. Johnson*, a case whose facts mirror those of this case. 798 F.3d 1096, 1105 (D.C. Cir. 2015). An office worker's illness "caused her to miss a significant amount of work." *Id.* at 1098. The employee asked to start her day late and to work from home, insisting that doing so "would not have interfered with [her] ability to do [her] job." *Id.* at 1106. Her employer disagreed, as did the Circuit. Given the record on summary judgment, the Circuit explained, any reasonable jury would conclude "that it was essential to [the employee's] job that she be present for interactive meetings during normal business hours" to meet with coworkers and engage in other in-person activities. *Id.* at 1106–07.

On the other side, take *Langon v. Department of Health and Human Services*. 959 F.2d 1053 (D.C. Cir. 1992). A computer programmer suffered from multiple sclerosis. *Id.* at 1054. She asked to work from home and testified that she could program well outside of the office. *Id.* at 1054–55. Her employer replied that programming did not "lend itself to working at home" but did not "offer any . . . affidavit or deposition" testimony saying so. *Id.* at 1060. The Circuit found that a factual question existed as to whether programming required in-person attendance. *Id.* at 1060–61. Or take *Solomon v. Vilsack*. 763 F.3d 1 (D.C. Cir. 2014). A disabled employee could not work regular hours but "continued to perform all of her job duties and to complete all of her work." *Id.* at 6. "Because of her efforts, [she] never missed a single work deadline throughout the acute phase of her illness." *Id.* Her employer fired her anyway, insisting that regular hours were essential to her job. *Id.* at 7–8. The Circuit let a jury decide the issue, emphasizing the employee's immaculate performance on a flexible schedule. *Id.* at 12.

In this case, the parties agree that Gibson has a disability, that she suffered an adverse employment action, and that she was qualified for her position only if she could work remotely. *See, e.g.*, Pl.'s Mem. of L. in Opp'n to Def.'s Mot. for Summ. J. at 3–8, Dkt. 31. They disagree as to whether in-person attendance at the Berkshire was necessary to perform Gibson's job's essential functions. Because any reasonable jury would find that it was, the Court finds that Gibson was not qualified for her position as a matter of law and will grant Gables' motion for summary judgment on Gibson's disability-discrimination claim.

The Court begins with Gables' view on Gibson's role, which it gives "substantial weight." *Hunt*, 66 A.2d at 990 (cleaned up); *Molson Coors*, 610 F. Supp. 3d at 289. According to Gables' Senior Vice President for Human Resources, Gibson's role "truly required an onsite presence." Decl. of Philip Altschuler ¶ 13, Dkt. 26-4. Indeed, while Gables allowed assistant community

6

managers (including Gibson) to work remotely for one day a week during the height of the COVID-19 pandemic, it ended that arrangement as quickly as it could—it found that "the one-day remote didn't work well" and "was very problematic." Dep. of Philip Altshuler 33:11–15, Dkt. 26-11. No evidence suggests that Gables ever saw things differently.

Other contextual factors confirm that onsite work was essential to Gibson's position at Gables. Although Gibson's job description did not explicitly require in-person work, it listed "[e]ssential [j]ob [f]unctions"—such as providing "clerical and phone support" and maintaining "all resident[] files"—that would have required Gibson to be physically present in her office at the time that she was hired. Gibson Dep. ex. 9 at 1, Dkt. 31-2 (job description); *see* Def. SUF ¶ 150 (explaining that, because "Gables had copper phone lines," its staff could not answer the phone while out of the office at the time Gibson was hired); Gibson Decl. ¶ 15(d) (acknowledging that "files and records" were kept in the Berkshire's office).[3] So too, Gibson does not contest that all other Gables assistant community managers spent most of their time working in-person, even during the pandemic. *See, e.g.*, Def.'s SUF ¶ 157 (uncontested); Decl. of Patti Ney ¶ 22, Dkt. 26-12. Nor does she contest that the assistant community managers before and after her worked in person. Decl. of Jacqueline Gerber ¶ 5, Dkt. 26-7 (predecessor); Decl. of Raashir-Imani De'Sert ¶ 4, Dkt. 26-8 (successor). All this suggests that in-person work was necessary for Gibson's role. *Hunt*, 66 A.2d at 991; 29 C.F.R. § 1630.2(n)(3)(i).

---

[3] Gibson contests this claim, pointing to a section of her supervisor's deposition in which he claims that he "had full access" to Gables' systems while working remotely. Pl.'s Resp. to Def.'s SUF ¶ 150; *see* Dep. of Jose Alvarado 23:6–9, Dkt. 31-7. In context, however, her supervisor's reference to "full access" clearly refers to Gables' computer systems, not its phone systems. *See* Dep. of Jose Alvarado 22:21–25:22. The Court therefore concludes that no reasonable juror could find that Gibson would have been able to answer phone calls to the Berkshire remotely before the pandemic. Similarly, Gibson says that "resident file keeping" was "maintained by email," Pl.'s SUF ¶ 58, but the deposition testimony she cites in support of that proposition does not discuss file maintenance, *see* Gibson Dep. 259:19–260:8.

Most importantly, the record makes clear beyond genuine dispute that Gibson could not have done her job well remotely. Start with Gibson's duty "to tend to residents' complaints and requests." Pl.'s SUF ¶ 66. Gibson represents that she could have handled such tenant requests by phone and email. *Id.* ¶ 60. But any reasonable jury would find that approach inadequate. Uncontroverted evidence shows that some residents of the Berkshire who had "been tenants at the Berkshire for decades . . . [did] not utilize email or cell phones," making in-person communication a necessity. Decl. of Raashir-Imani De'sert ¶ 14. *Compare* Def.'s SUF ¶ 43, *with* Pl.'s Resp. to Def.'s SUF ¶ 43 (failing to controvert this point). As to the rest, the record shows more than a marginal number of residents sought in-person meetings with the Berkshire's management even during the pandemic.[4]  *See* Decl. of Jose Alvarado ¶ 24, Dkt. 26-6; Decl. of Patti Ney ¶ 6, Dkt. 26-

---

[4] Gibson finds it unlikely that residents of the Berkshire sought to communicate in-person with building staff during March, April, and May of 2020, arguing that "it is quite questionable that people would risk their health and their lives . . . during the most deadly phase of the pandemic" to "ask questions." Pl.'s Mem. in Opp'n to Summ. J. at 4 n.2, Dkt. 31. But Gibson's speculative remarks about behavior during that period are not evidence and "do not establish the absence or presence of a genuine dispute" of fact. Fed. R. Civ. P. 56(c)(1)(B).

Gibson also offers a declaration she describes as showing that "there were at most 1 or 2 walk ins to the [Berkshire's] management office in a week." Pl.'s Mem. in Opp'n to Summ. J. at 5. That is not what the declaration actually declares, however. Rather, it says that while "there were many weeks [when] only 1-2 residents would come to the office," "[f]oot-traffic to the management office *could be significant from time to time*"—confirming Gables' position that Gibson needed to be prepared to handle in-person complaints and requests from residents. Gibson Decl. ¶ 4 (emphasis added). In any event, Gibson was not present at the Berkshire after March 17, 2020. Gibson Dep. 115:10–11, 145:3–6. As a result, she lacks personal knowledge whether meetings were held there after that time and cannot offer admissible evidence on the point. Fed. R. Evid. 602.

Finally, Gibson asserts that "from March 2020 until June 15, 2020, Gables did not . . . allow walk-ins" in its management office and that "there is no evidence indicating a single person made an appointment during this period." Pl.'s Mem. in Opp. to Summ. J. at 6. Not true. Jose Alvarado, the Berkshire's community manager, says that he held "in-person meetings" with foreign exchange "students attempting to break their leases" in May of 2020. Decl. of Jose Alvarado ¶ 24, Dkt. 26-6. Gibson replies that "a vast majority" of the Berkshire's exchange students "did not know English very well and therefore . . . never dropped by the management

12. Plus, as Gables explained in 2020 and as Gibson does not dispute, property management "is a service business." Decl. of Patti Ney ¶ 8. Regardless of how frequently the need for face-to-face meetings arose, Gables was entitled to hire an assistant community manager who could meet onsite with tenants when necessary. *Cf. Molson Coors*, 610 F. Supp. 3d at 289 (holding on summary judgment that company could permissibly insist that salesman meet in-person with clients, even though salesman alleged he could sell effectively while remote).

Similarly, any reasonable jury would find that Gibson's back-office duties required her to work in person. Gibson does not seriously contend that she could have helped with internal audits or inspections of the Berkshire's files and facilities from offsite, and for good reason—the evidence is unequivocal that Gables' internal audits required in-person attendance at the Berkshire during normal business hours. *Compare* Def.'s SUF ¶¶ 47–48 (explaining that "Gables utilizes internal auditors that come onsite at a property for multiple days at a time" and that "[t]he assistant community manager is required to be present onsite during property audits to facilitate any needs the auditors may have"), *with* Pl.'s Resp. to Def.'s SUF ¶¶ 47–48 (contesting only how frequently audits occurred). So too, the record clearly shows that Gibson could not have "back[ed] up [her] community manager" well from outside the office. Pl.'s Resp. to Def.'s SUF ¶ 27. During the pandemic, Gibson's backup duties included "assist[ing] with cleaning and sanitizing touchpoints throughout" the Berkshire and "walk[ing]" through its hallways "to make sure residents were complying with" social-distancing rules. Def.'s SUF ¶¶ 120–21 (uncontested). Before the pandemic, they encompassed assessing damaged apartments and dealing with disruptive residents. *Id.* ¶ 75 (uncontested); Decl. of Jose Alvarado ¶ 9 & ex. 1. Those are not tasks Gibson could have

---

office to ask a question," Gibson Decl. ¶ 15(b), but that is nonresponsive. Even if many exchange students did not ask questions of the Berkshire's management in person, that reality would not impeach Alvarado's testimony that some did.

9

performed well remotely, and Gibson does not offer admissible evidence suggesting otherwise.[5] Even if Gibson could have managed some of them while away from the Berkshire—for example, by deputizing maintenance workers to inspect damaged apartment units on her behalf, Pl.'s Resp. to Def.'s SUF ¶ 41—the DCHRA did not forbid the Berkshire's community manager from keeping a fully capable assistant on hand. *Cf. Molson Coors*, 610 F. Supp. 3d at 289 (rejecting employee's contention that travel was not an essential function of his position when employee could "better accomplish" his assigned tasks through travel).

Finally, and independently, any reasonable jury would find that Gibson's organizational responsibilities required her to be present at the Berkshire during business hours. Gables held onsite meetings once a week during the pandemic, meetings Gibson does not say she could have attended remotely. Def.'s SUF ¶¶ 55, 118, 157, 166; *cf. Doak*, 798 F.3d at 1105 (finding employee unqualified as a matter of law when she could not "perform an essential function of her job: being present in the office to participate in interactive, on-site meetings"). And Gibson's job description charged her with "supervising" the Berkshire's "office and maintenance team[s] in the absence of the [c]ommunity [m]anager," Gibson Dep. ex. 9 at 1, a responsibility that Gibson all but concedes required in-person attendance. In short, even setting aside Gibson's other roles, the meeting-related and supervisory responsibilities of Gibson's position made it unrealistic for her to work outside the Berkshire.

---

[5] Gibson contends that the Berkshire's "[m]aintenance team was responsible for conducting the final inspection of the units upon [a] resident's move-out, and tak[ing] any necessary photos" of damage "that the unit may have incurred." Pl.'s Resp. to Def.'s SUF ¶ 41. In the deposition testimony Gibson cites for that proposition, however, Gibson admits that she would "sometimes" inspect damaged units herself and that doing so "was . . . part of [her] responsibility" as an assistant community manager. Gibson Dep. 91:10–17. Accordingly, any reasonable jury would conclude that Gibson's duties as an assistant community manager required Gibson to inspect damaged apartments herself, at least occasionally.

Gibson's counterarguments fall flat. Although Gibson insists that she could have done her job remotely, her say-so does not create a dispute of material fact, particularly in light of Gables' contrary position. *Cf. Hunt*, 66 A.3d at 890–91. Similarly, even if Gibson could have handed off tasks requiring in-person work to others, the DCHRA does not require employers to "reallocate essential functions of a particular position" to assist disabled employees. *Strass v. Kaiser Found. Health Plan of Mid-Atl.*, 744 A.2d 1000, 1008 (D.C. 2000).

Gibson says another Gables employee works remotely in a role like Gibson's, suggesting that Gibson could have worked remotely as well. But that employee, Jacqueline Gerber, holds a different title—"centralized business manager"—than Gibson. Pl.'s SUF ¶ 32. She carries substantially different duties too. *See, e.g.*, Dep. of Jacqueline Gerber at 5:15–18, Dkt. 31-10 ("My responsibilities are primarily admin, reporting, [and] overseeing residential files from . . . move-in to move-out.").[6] Confirming that Gibson and Gerber play different roles at Gables, Gerber emphasizes (and Gibson does not contest) that "a full-time on-site assistant community manager" works at "each of the properties" Gerber serves as a centralized business manager. *Id.* at 22:1–7. As a result, Gerber's experience does not give a reasonable jury grounds for thinking that Gibson could have worked remotely as an assistant community manager. To the extent that Gibson contends instead that Gables should have created an extra centralized business manager role for her to fill, that contention fails as a matter of law. *Hunt*, 66 A.3d at 991–92 (explaining that, under the DHCRA, an employee may only seek reassignment to an existing and vacant position).

---

[6] Gibson offers a job posting for a different "centralized business manager" role in Alta Murrieta, California that describes the duties of a centralized business manager differently. Gibson Dep. ex. 1 at 1, Dkt. 31-2. She offers no evidence from which a jury could conclude that the California posting describes Gerber's role, however, and Gerber affirmatively testified that it does not. Dep. of Jacqueline Gerber at 16:5–13, Dkt. 31-10. Accordingly, the record does not allow for reasonable disputes of material fact regarding the content of Gerber's position.

Gibson points to aspects of her role that she says she could perform remotely or outside regular business hours, like processing rent checks or handling lease renewals. *See, e.g.*, Pl.'s SUF ¶¶ 4, 57. But an employee must be able to perform *all* the essential functions of her position to be qualified for it. *Cf. Adams v. District of Columbia*, 50 F. Supp. 3d 47, 54–55 (D.D.C. 2014); *McNair v. District of Columbia*, 11 F. Supp. 3d 10, 15–16 (D.D.C. 2014). Gibson does not suggest that the duties she could not perform remotely were "marginal" rather than "essential," making her ability to perform the rest of her job irrelevant. 28 C.F.R. § 1630.2(n)(1).

Gibson's remaining arguments rest on factual assertions she does not adequately support or on evidence that actively undermines her position. Gibson says that the testimony of Desiree Marshall, a former Gables assistant community manager, creates a jury question as to whether she could have handled resident complaints and requests remotely. *See* Opp'n at 6. Marshall did testify "that the only person who really needed to be on site" at Gables' properties "would be the leasing professional, because they have to tour prospects throughout the community." Dep. of Desiree Marshall at 38:1–6, 19–21, Dkt. 31-11; *see also id.* at 31:19–20 (adding that "for the most part" existing apartment residents "would call in" to "[her] property"). But Marshall added that her residents did visit building management with complaints or requests and that, when residents appeared in-person, someone from Gables would need to assist them. *Id.* at 38:16–39:14. Marshall's testimony thus confirms that Gibson could not have worked remotely without reallocating one aspect of her essential duties—responding to resident complaints and requests—to another Gables employee.[7] *Cf. Strass*, 744 A.2d at 1008.

---

[7] Gibson also asserts that Gables imposed "strict no-contact rules" on its employees "[a]s of April 9, 2020," meaning "everyone at Gables was required to communicate . . . via email and phone only" after that time. Pl.'s SUF ¶ 14. She cites no record evidence in support of that assertion, and the Court can find none supporting it either. The Court will therefore disregard it. Fed. R. Civ. P. 56(e).

12

Similarly, Gibson acknowledges that her job required her to assist with internal Gables audits but insists that those audits generally only happened once a year. Pl.'s Resp. to Def.'s SUF ¶ 48; Gibson Decl. ¶ 15(d). Regardless, the uncontested record evidence indicates that at least one audit occurred in Gibson's absence and that, with Gibson away, "the Berkshire began to fall behind on its audits." Decl. of Jose Alvarado ¶ 18. And Gibson says nothing at all about the undisputed evidence that she could not participate in in-person staff meetings or help monitor resident compliance with social-distancing rules while absent from the Berkshire's management office. *See, e.g.*, Def.'s SUF ¶¶ 119–21, 157, 166. Those concessions alone doom Gibson's case. *See Doak*, 798 F.3d at 1105 (describing "being present in the office to participate in interactive, on-site meetings" as part of an employee's "essential function").

Changing gears, Gibson accepts (or at least does not contest) that she could not effectively supervise the Berkshire's in-person employees from offsite. But she denies that she held supervisory duties, even as a backup when the community manager was elsewhere. Pl.'s SUF ¶ 47. *But see* Pl.'s Resp. to Def.'s SUF ¶ 26, Dkt. 31-1 ("Plaintiff does not dispute that her job was to back up the community manager."). No reasonable jury could agree. Gibson's job description charged her with "supervising" the Berkshire's "office and maintenance team[s] in the absence of the [c]ommunity [m]anager." Gibson Dep. ex. 9 at 1. What is more, Gibson conceded under oath that she held some supervisory responsibilities over her building's concierge. *See* Gibson Dep. 116:14–17. In response, Gibson says her deposition testimony establishes that all supervisory duties at the Berkshire "belonged to the [c]ommunity [m]anager," but her testimony does not say that. Pl.'s SUF ¶ 47 (citing Gibson Dep. 116:9–117:1). Rather, it says that Gibson did not "primarily" supervise the Berkshire's concierge. Gibson Dep. at 116:10–15 ("Q: Did you have any role with respect to monitoring [the concierge's] performance . . . ? A: Between myself

and the community manager, primarily the community manager.")  And while Gibson's job description says that Gibson lacked "direct reports," that does not mean she did not supervise other staff in the community manager's absence—as the same job description says she did.  Gibson Dep. ex. 9; *cf. George v. Leavitt*, 407 F.3d 405, 407 (D.C. Cir. 2005) (describing scenario in which employee "had direct day-to-day supervisory responsibility" but "was not officially classified as a manager").

"In determining whether a function is essential to a particular position, the Court is to grant [an] employer substantial deference."  *McNair*, 11 F. Supp. 3d at 15; *see Hunt*, 66 A.3d at 991. Here, Gables says that its assistant community managers must work at the communities they help manage, and it offers direct and circumstantial evidence supporting its position.  Gibson responds by speculating that she could have handled parts of her job from elsewhere.  That is not enough: "a plaintiff's mere speculation" does not authorize courts or juries to "second-guess an employer's business judgment."  *Elhusseini v. Compass Grp. USA, Inc.*, 578 F. Supp. 2d 6, 22 (D.D.C. 2008) (cleaned up).  Because no reasonable jury could find that Gables' conclusion that its assistant community managers must work onsite was anything besides a permissible exercise of business judgment, Gibson's discrimination claim under the DCHRA must fail.

      **B.**      **Failure to Accommodate**

For similar reasons, the Court will grant summary judgment to Gables on Gibson's failure-to-accommodate claim.  The DCHRA requires employers to grant reasonable accommodations to qualified employees and to "engage in an interactive process" while handling accommodation requests.  *Molson Coors*, 610 F. Supp. 3d at 290.  But those duties do not attach when an employee is not qualified.  *See id.*  Because the Court has already concluded that Gibson was not qualified for her role, it follows that Gibson's failure-to-accommodate claim fails.

Indeed, although Gibson's complaint raises separate claims for disability discrimination and for failure to accommodate, Gibson does not argue that her failure-to-accommodate claims survive even if her disability discrimination claims fail. As a result, she has forfeited any argument that they do. *Cf. Barot v. Embassy of Republic of Zam.*, 299 F. Supp. 3d 160, 165 n.1 (D.D.C. 2018) (explaining that, although a plaintiff cannot forfeit a motion for summary judgment, she may forfeit specific arguments against summary judgment). The Court will independently grant summary judgment to Gables on that basis.

### C.  Retaliation

Finally, the Court will grant summary judgment to Gables on Gibson's retaliation claim. To send her retaliation claim to the jury, Gibson must offer evidence that Gables took adverse action against her because she requested an accommodation or otherwise exercised her rights under the DCHRA. *Carpenter v. Fed. Nat'l Mortg. Ass'n*, 174 F.3d 231, 235 n.3 (D.C. Cir. 1999); *see* D.C. Code § 2-1402.61. Gibson offers no such evidence. Instead, the record clearly reflects that Gables terminated Gibson's employment because it concluded she was unqualified for her position. Right or wrong, that is not retaliation under the DCHRA.

### CONCLUSION

For these reasons, the Court will grant Gables' motion for summary judgment. A separate order accompanies this memorandum opinion.

March 22, 2024

DABNEY L. FRIEDRICH
United States District Judge